# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 23-187

STATE OF LOUISIANA

VERSUS

VERNELL ARCONZE CHATMAN, JR.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 25192-19
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Shannon J. Gremillion, and Guy E. Bradberry, Judges.

AFFIRMED.

**Annette Fuller Roach**
**Louisiana Appellate Project**
**P. O. Box 6547**
**Lake Charles, LA 70606-6547**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT-APPELLANT:**
    Vernell Arconze Chatman, Jr.

**Hon. Stephen C. Dwight**
**District Attorney, Fourteenth Judicial District**
**Karen C. McLellan**
**Assistant District Attorney**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PICKETT, Judge.**

On December 19, 2019, Vernell Arconze Chatman, Jr., was charged with second degree murder for the death of Kayla Mackenzie Jones, in violation of La.R.S. 14:30, and the first degree feticide of Ms. Jones's unborn child, in violation of La.R.S. 14:32.6. He was convicted by a unanimous jury of the responsive verdict of manslaughter of Ms. Jones, a violation of La.R.S. 14:31, and of the responsive verdict second degree feticide of her unborn child, a violation of La.R.S. 14:32.7. He subsequently filed a motion for a new trial contending that the verdict was contrary to the law and evidence. Following a hearing, the trial court denied the motion.

The trial court sentenced the defendant to serve thirty-two years at hard labor for the manslaughter conviction and eight years at hard labor for the second degree feticide conviction. The trial court determined that the feticide represented 'a separate life . . . lost" and ordered that the sentences be run consecutively for a total sentence of forty years at hard labor. The defendant filed a "Motion to Reconsider Sentence," in which he asserted that his sentences were excessive "under the circumstances." The trial court denied the motion without a hearing.

The defendant appeals his convictions and sentences, raising four assignments of error: (l) the state's evidence was insufficient to find him guilty of manslaughter, (2) the state's evidence was insufficient to find him guilty of second degree feticide, (3) his conviction for second degree feticide was a violation of double jeopardy, and (4) his sentences are both excessive individually and should be run concurrently rather than consecutively.

## FACTS

On the morning of November 16, 2019, Ms. Jones's dead body was found in a park in Lake Charles. The Lake Charles Police Department investigated her death.

Charles Hunter, Jr.,[1] the chief investigator for the Calcasieu Parish Coroner's Office, testified that based on the "tremendous amount" of dirt and leaves in Ms. Jones's hair that did not match the surrounding area where her body was found, it was apparent to him that Ms. Jones did not die where her body was lying and opined that she "may have been dropped off at that location." Mr. Hunter also noted that Ms. Jones was lying stretched out with her legs straight and her hands above her head.

Mr. Hunter related that the clothes Ms. Jones was wearing were insufficient for the cold temperature, which was in the low thirties. He testified that the pajama pants she was wearing were on backwards and not pulled all the way to her waist. He further testified that her body was very dirty and had "numerous scrapes and abrasions and bruises across most of the surfaces of her body." Despite the dirt on her skin and shirt, Mr. Hunter noted that the pajama pants Ms. Jones was wearing were rather clean. He explained that white foam or froth coming from her mouth and nose as depicted in crime scene photographs can be caused by an overdose, suffocation, or death from asphyxiation. Based upon cuts and scrapes to her arms, legs, and face, Mr. Hunter concluded that Ms. Jones was in an altercation. He did acknowledge, however, that the injuries could have been caused by other means, including if she were hallucinating and thrashing around on the ground.

Sergeant Willie Fontenot, a violent crimes detective with the Lake Charles Police Department, testified that on November 16, 2019, he was dispatched to the corner of Holmes Street and Kline Street at 7:45 a.m. After observing the victim and speaking with officers on-site, Sergeant Fontenot was informed that Mr. Brandon Mentor, who lived near the park, had reported Ms. Jones's location.

---

[1] Based on his work as a death investigator beginning in 2006 and being involved in over 15,000 death investigations, the trial court accepted Mr. Hunter as an expert in the field of death investigation.

According to Sergeant Fontenot, he and Sergeant William Loving went to Mr. Mentor's apartment and learned that he lived with his cousin, Bryan Love (Bryan), Bryan's wife, Lucia, and their children. During the visit, Sergeant Fontenot learned that Noah Love, a nine-year-old, was a witness.

At that time, Sergeant Fontenot interviewed Mr. Mentor, Bryan, Lucia Love, Larry Chatman, Jarred Chatman, Jasmine Jack, and the defendant. He noted that, after the interviews, both the defendant and Larry Chatman were arrested.[2]

The state played the defendant's videotaped statement for the jury. According to the defendant, he lived with his brother Jarred and Jarred's girlfriend, Jasmine Jack. He noted his other brother, Larry, would come over but lived with his "baby mama." The defendant stated he had seen Ms. Jones the day before, between 4 and 6 p.m., at Abraham's Tent, an organization in Lake Charles that provides meals for the homeless. The defendant stated he spoke with Ms. Jones at Abraham's Tent before she left with someone else. According to the defendant, he met up with Ms. Jones again after dark at the convenience store near Abraham's Tent. He claimed that Ms. Jones told him she was going somewhere else and left the store with someone he did not know.

The defendant stated that after Ms. Jones left the store, he went to "Sunlight Manor" to speak with a lady named "Ms. Maddy." Despite claiming that he last saw Ms. Jones at the convenience store, the defendant admitted he was at his house alone with Ms. Jones when pressed by Sergeant Fontenot. He acknowledged smoking "mojo" (synthetic marijuana) with Ms. Jones. At some point, Ms. Jack came home and argued with Ms. Jones. When asked if Ms. Jones "wigged out" after smoking, the defendant denied that she had any troubles and said she left

---

[2] Larry Chatman served two years in jail before pleading guilty to obstruction of justice and being released.

peacefully. He could not say where she went. After being told that everyone else claimed she was "flipping out," the defendant maintained that Ms. Jones was verbal about leaving but was not having any physical issues and that he did not have to physically remove her from the apartment.

Once law enforcement informed the defendant that witnesses told them he carried Ms. Jones from his porch to the park, the defendant countered that she was holding onto his arm and that he helped her walk across the street. When asked why Ms. Jones had to be removed from the home, it took nearly three minutes before the defendant finally answered, saying she had gone a little crazy. The defendant repeatedly denied hitting Ms. Jones in any way. He stated that when Ms. Jones came to the house, she was dressed but not in winter clothes, and he acknowledged putting pants on her after helping her from the house. When asked if his brother Larry helped him bring Ms. Jones across the street, the defendant denied that Larry helped and claimed he alone brought Ms. Jones to the back corner of the park. According to the defendant, he realized Ms. Jones was missing her shoes while helping her to the park. He explained he found the shoes near the steps to his apartment, brought them to her, put them on her feet, then left her on the grass at the back of the park.

According to the defendant, at some point in the early morning hours, he and his brothers went outside looking for a dog that had gotten loose. The defendant denied knowing Ms. Jones was still in the park at that time. He also denied ever saying "Die" to the victim or laying his hands on her. He repeatedly stated, "I never hurt Kayla!" The defendant subsequently acknowledged that it was a mistake to simply leave Ms. Jones out in the cold.

Eventually, the defendant stated that he attempted to hold Ms. Jones "to control or constrict, not to hurt or harm." He indicated that she was on the ground

4

while he was trying to hold her down to prevent her from injuring herself. The defendant acknowledged that his actions may have looked like he was choking her. He adamantly denied ever kicking Ms. Jones. The defendant subsequently stated that he sometimes hallucinated when he smoked "mojo" and that he smoked some with Ms. Jones that day. He then stated that he had numerous mental health problems and that he was off his medication.

On cross-examination, Sergeant Fontenot acknowledged that although he initially arrested the defendant's brother, Larry, as a principal due to a witness saying Larry was at the park with the defendant and Ms. Jones, the investigation subsequently confirmed that information was false. Sergeant Fontenot also acknowledged that the same witnesses told him the defendant had suffocated Ms. Jones in front of the house, despite stating that she was alive when she was brought to the park later. He admitted that the witness statements were confusing.

During the investigation, Noah Love was brought to the Children's Advocacy Center to be interviewed. Mr. David Duplechain of the Family & Youth Counseling Agency in Lake Charles interviewed Noah. Mr. Duplechain testified that he was a vice president within the agency and that his work involved, among other things, doing "forensic interviews of children who are alleged to have been sexually abused, physically abused, or are witnesses to violent crime." Mr. Duplechain interviewed Noah on November 16, 2019. The recording of Noah's interview was played for the jury.

When Noah testified at trial, he was twelve years old. According to Noah, on the night Ms. Jones died, his father told him to go outside and see what was happening because he heard a woman screaming. Noah stated that, at that time, he, his dad, and his two brothers were in their apartment and that he was watching cartoons in bed. He testified that he heard the scream at 9:30 p.m., went outside,

and by the light of the porch light saw "[a] man beating on a woman, kicking her in the side and slapping her in the face." Noah testified that the man was "Pernell," his neighbor, and identified the defendant as the person he referred to as "Pernell." Noah stated that "Pernell" lived with "JD, Jaz, and LC," but he did not know the real names of those three individuals. According to Noah, the woman was on the ground close to the apartment, and the defendant was slightly further from the apartment, standing over her. Noah testified that he went back inside, and about two minutes later, the woman stopped screaming for help. He told his father what he saw, then they locked the door and turned off the porch light.

On cross-examination, Noah then testified no one was in his apartment except himself, his dad, and his two brothers, and he specifically denied that Larry Chatman or any women were there. While he acknowledged that his dad "used to do [drugs]," he denied that his father was doing drugs that night. Noah testified he heard the defendant say "Get away from her. She's pregnant," after he stopped hitting and kicking Ms. Jones. Noah then clarified that he heard the defendant say this after he (Noah) had gone back inside and closed the door. He also stated that he could not see the defendant when he heard that statement.

Sergeant William Loving testified that on November 16, 2019, he was dispatched in relation to a deceased female on the side of the road. A pair of shoes was found roughly fifteen feet from the woman. Sergeant Loving testified that he and Sergeant Fontenot knocked on doors at the small apartment complex located across the street from the park where Ms. Jones was found. He further testified that Ms. Jones was at the entrance to the park very close to the front of the driveway to the apartments. He recalled speaking with the occupants of Apartment 8: Larry, Jarred, and Vernell Chatman. Sergeant Loving testified that, despite officers not mentioning the park and simply asking about a white female, the Chatman brothers

6

"kept looking towards the park" while he was speaking with them. Sergeant Loving was not wearing a body camera during the interaction, but another officer who was with him had his body camera turned on. The video from the body camera was introduced into evidence and played for the jury.

Dr. Terry Welke, the Coroner and Forensic Pathologist for Calcasieu Parish, was accepted without objection by the trial court as an expert in the field of forensic pathology. Dr. Welke testified that he listed Ms. Jones's cause of death as "blunt force injuries-asphyxia-hypothermia" and identified her death as a homicide. He did not believe, however, that the blunt force injuries alone would have been sufficient to kill Ms. Jones. After acknowledging there are numerous ways asphyxia can occur, Dr. Welke testified that in the instant case, he believed Ms. Jones suffered a "smothering type of asphyxia."

Dr. Welke explained that his conclusion was based upon a superficial scrape on Ms. Jones's nose and a bruised area on the inner portion of her lower lip, which indicated to him that someone had cupped their hand over her mouth. He did not observe petechiae, a common sign of suffocation, in Ms. Jones's eyes but noted he had also seen hangings where petechia were not present. He stated that he was unconcerned about the foam near Ms. Jones's nose and mouth, noting this can happen with drug overdoses or drowning but can also occur any time there is an irregularity of the heart, such as asphyxiation.

Dr. Welke testified that Ms. Jones's blood contained traces of cocaine, benzolecgonine (a cocaine byproduct), methamphetamine, amphetamine, and marijuana. Nonetheless, he felt that the levels of the drugs in Ms. Jones's system would not have been sufficient to result in an overdose death. Regarding hypothermia, Dr. Welke noted that when the body's internal temperature gets to around eighty-six degrees, atrial fibrillation occurs, and a person's heart becomes

inefficient. He further explained that at around eighty-two degrees, ventricular fibrillation occurs, and the heart stops functioning. Dr. Welke noted that because Ms. Jones was woefully underdressed for the low temperature, he would have expected her body to be curled up in the fetal position in an attempt to stay warm if she had died purely of hypothermia. Because she was not in the fetal position, he believed Ms. Jones's arms were outstretched because she was positioned that way after her death. He testified Ms. Jones's injuries were consistent with someone sitting or lying on her chest and cupping their hand over her mouth and nose.

Dr. Welke noted that if Ms. Jones had not died from being smothered, she likely would have had brain damage that would have prevented her from moving her body while she subsequently died of hypothermia. He testified Ms. Jones's knuckles were skinned and noted that could be the result of someone fighting with her or from her "flailing around and causing those injuries to herself." Regarding the bruises on her body, he noted that based on their coloration, they were not old, but he could not say if they were half an hour old or three days old.

Dr. Welke did not do an autopsy on Ms. Jones's unborn child, but he testified that the child was a male that appeared to be approximately eight months and a week developed with "no evidence of significant natural disease." The child was sixteen and one-quarter inches long and weighed a little over eight pounds. Despite not doing an autopsy, Dr. Welke testified that he believed the child would have been viable if born prior to Ms. Jones's death and that he "felt the baby died as a result of the mother's death." After explaining that it is impossible to get an exact time of death unless someone dies in the hospital, Dr. Welke estimated that Ms. Jones died around 4:00 a.m. on November 16, 2019. He then stated, however, it was possible that she may have died at 10:30 p.m. the prior night.

On cross-examination, Dr. Welke reiterated that he believed Ms. Jones's flailing around on the ground, whether because someone was on top of her or she was simply flailing, could have caused the injuries to her legs and back. He also reiterated that he believed the injury to her nose was from either a hand or pillow being compressed around her nose and mouth. He could not recall examining anyone who overdosed on "mojo" or synthetic marijuana. Additionally, while he stated the level of drugs in Ms. Jones's system was too low for an overdose, he acknowledged that no tests were done which would have shown the level of synthetic marijuana in her system. Dr. Welke opined that Ms. Jones was already dead when she was placed in the park. He clarified that, even if she was not dead when she was brought to the park, he felt the asphyxia that occurred before she was brought there would have rendered her unable to protect herself from hypothermia and would have ultimately resulted in her death.

The state's final witness was Ms. Jasmine Jack, who acknowledged having a felony conviction for possession of a firearm with obliterated numbers, misdemeanor convictions for criminal trespass, resisting an officer, and drug paraphernalia. According to Ms. Jack, in November of 2019, she was dating the defendant's brother, Jarred Chatman, and living with Jarred, the defendant, and their other brother, Larry Chatman. Ms. Jack testified that she knew Ms. Jones because Ms. Jones would come to the apartment to get high. Ms. Jack acknowledged telling Sergeant Fontenot that her initial interview was a lie and that she did not see anything because she "was told if I take this stand today I'm dead. Let the record reflect."

As to the night Ms. Jones died, Ms. Jack testified she saw Ms. Jones outside the apartment "on the ground hollering and screaming in pain, and Vernell was right there with her." She further testified the defendant was leaning over Ms.

9

Jones and it looked like he was trying to calm Ms. Jones down, but she then heard the defendant yell "Die, bitch, die." She explained she heard this statement while she was inside the apartment and returned outside where she saw the defendant holding down Ms. Jones's elbows "so she can't swing at him."

On cross-examination, Ms. Jack testified that she had not done drugs in about seven and a half months at the time of trial, noting she had been smoking mojo but quit. She testified that she initially lied to law enforcement because she felt "the homicide detectives was [sic] threatening." She then claimed the defendant's mother called her before she was interviewed by law enforcement and threatened her. Although she acknowledged lying to law enforcement during her initial interview, Ms. Jack claimed she did not remember what she said to law enforcement because she was under the influence.

Ms. Jones testified Ms. Jones was still near the apartment when Jarred Chatman returned home from work, typically around 11:30 p.m. She then stated she was positive that, at 11:00 p.m., Ms. Jones was on the ground "with her t-shirt and panties on hollering." She stated that neither she nor Jarred wanted Ms. Jones in the apartment because "when she gets high she flashes out, and she was pregnant." She testified that when she returned to the apartment after being told Ms. Jones was there, both Larry Chatman and the defendant were present, and Ms. Jones was sitting next to the defendant.

Ms. Jack stated she never told the defendant to get Ms. Jones out of the house and claimed she never laid a finger on Ms. Jones. According to Ms. Jack, she and her friend, Shameka Smiley, were both at Bryan's apartment getting high, and Ms. Smiley went back to Ms. Jack's apartment and smoked with the defendant and Ms. Jones before waking her (Ms. Jack) up to tell her Ms. Jones was at the apartment. Ms. Jack stated that she was passed out at Bryan's apartment before Ms.

10

Smiley woke her up. Ms. Jack contested the notion that she and Ms. Jones had a fight because Ms. Jones would not leave. According to Ms. Jack, she told the defendant that it was on him because Jarred did not want Ms. Jones getting high at the apartment when she was pregnant. Ms. Jack then returned to Bryan's, rolled another blunt and passed out again.

Ms. Jack explained that she did not want Ms. Jones at the apartment because she did not approve of a pregnant woman getting high and that Jarred did not want her there "because he was a registered sex offender." She testified that when Larry and the defendant said Ms. Jones did not have to leave, she returned next door and smoked more mojo. After stating that she smoked "a lot" of mojo that day, Ms. Jack testified she was also on PCP, claiming everyone except the defendant was also doing PCP.

According to Ms. Jack, Ms. Jones smoked some crack, in addition to the mojo she had smoked, and then started "flashing out." She defined "flashing out" as "[l]aying on the floor flipping like a little fish, hollering and screaming." She testified this would happen with Ms. Jones kicking and tearing up the apartment, until she came back around when the drugs wore off. Despite previously saying that Ms. Jones was still behaving when she left the apartment, Ms. Jack then testified that Ms. Jones had begun flashing out before she left and went back to Bryan's.

Ms. Jack later heard Ms. Jones screaming in pain while lying on the ground, which Ms. Jack attributed to her pregnancy and being held down on the ground. She testified that she saw the defendant had Ms. Jones's elbows pinned down trying to calm her down, noting that Ms. Jones had kicked off her pants while thrashing around on the ground. She further testified that the defendant put other pants on her afterwards.

11

Ms. Jack again testified it sounded like the defendant was trying to calm Ms. Jones down, yet she also stated that was not what she saw. She explained that the two of them were about ten to fifteen feet away from her on the ground and that Ms. Jones did not lose her clothing until she was outside the apartment. When pressed that it makes no sense for someone to scream "die, bitch, die" at a person they are actively trying to calm down and keep from hurting themselves, all she could say was "[m]aybe that person wasn't in their right state of mind." According to Ms. Jack, Ms. Jones was outside hollering and screaming for about an hour and a half before Jarred Chatman got home and that the defendant was next to Ms. Jones the entire time. Ms. Jack concluded her testimony by stating that she was positive she heard the defendant tell Ms. Jones to die, immediately after stating "at the end of the day everybody was full of drugs whether it was PCP, mojo, meth or crack."

After allowing the jury to review the physical evidence previously admitted, the state rested.

The defendant's first witness was Mr. Larry Chatman, his older brother. Larry testified that at the time of Ms. Jones's death, he was living with the defendant, Jarred, and Jasmine. He had four prior convictions for distribution of drugs as well as an obstruction of justice conviction. Larry noted that because people initially told law enforcement that he helped the defendant carry Ms. Jones to the park, he spent roughly two years in jail charged with second degree murder for Ms. Jones's death before he pled guilty to a reduced charge of obstruction of justice.

Larry testified that he had known Kayla Jones at least eight to ten years prior to her death and they were good friends. He related that, at some point, his brother Jarred had been "messing around" with Ms. Jones. Larry was not sure whether Ms.

Jones was homeless or not, stating that the only time he ever saw her sleeping outside was when she "was high on some bubble." He did not explain what "bubble" meant. Larry stated that people often used the park across from his old apartment to get high, including at all hours of the night. Larry acknowledged previously smoking in the park and testified that people used the park because it was located on a dead-end road and it just seemed like no one was going to investigate drug use there.

Larry testified he knew Ms. Smiley from her being around there a lot. He admitted that he frequently got high with her but testified that he did not recall if they smoked together the day Ms. Jones died, explaining that his memory was poor when he was high. Larry stated he often went to Bryan's apartment to get high, even when the Love children were home.

On the night Ms. Jones died, Larry testified that he arrived home between 8:00 and 9:00 p.m. At that time, the defendant was lying on the couch with his eyes closed; Larry was unsure if the defendant was high, asleep, both, or just lying on the couch. He went to Bryan's home to get high because Ms. Smiley and Ms. Jack were in the apartment. Ms. Jack joined him at Bryan's apartment, and the three of them got high while Bryan's kids were there. Larry stated Ms. Smiley then came to Bryan's and told them Ms. Jones was at Larry's apartment, so he told Ms. Jack to "go see what's going on." Larry testified that he then went home and that Ms. Jack and Ms. Jones had had an altercation that morning over the relationship between Ms. Jones and Jarred.

Larry testified that when he returned to his apartment, Ms. Jones was on the ground "spinnin on her back" and kicking all over the place. He went back to Bryan's because Ms. Jack and Ms. Smiley were about to change Ms. Jones's clothes. After talking to Bryan about how Ms. Jones was behaving, Larry testified

that he went back outside, and Ms. Jones was lying on the ground by the steps and that he placed a blanket on her due to the cold temperature. He further testified that there were already a couple blankets outside with Ms. Jones, but she had become uncovered. He stated that he argued with the defendant and Ms. Jack about Ms. Jones being outside.

Larry was in Bryan's apartment when Noah heard Ms. Jones and looked outside. According to Larry, the apartments are all basically one large room and a bathroom; therefore, he and Bryan were getting high in the same room where Noah and his brothers were. Acknowledging that he and Bryan were smoking mojo, Larry claimed that he never saw Noah open the door to the apartment or go outside, but he testified that he heard Bryan tell Noah to "close the door." Larry further testified that Bryan asked Noah, "who is that" and Noah answered "Vernell." Yet, he denied hearing Noah say anything about the defendant hitting or kicking Ms. Jones.

On cross-examination, Larry testified that he was waking up, after getting high and falling asleep, when he heard Noah tell his father it was the defendant who was outside. Although he admitted it was possible that Bryan may have heard screaming outside, Larry testified that he did not hear anything and Bryan never mentioned anything to him about hearing screaming. According to Larry, when he went outside to go home, the defendant was outside trying to wake Ms. Jones up. He stated Ms. Jones was still lying on her back, slightly to the side, and the defendant was next to her. Although he claimed he never heard anyone screaming, Larry acknowledged it was possible that he simply did not hear it because he was in and out of sleep while high. Larry claimed that he never saw Ms. Jones at the park across from his home and was unaware the defendant had had a previous sexual relationship with Ms. Jones.

14

Ms. Smiley testified that in November of 2019, she was living with Ms. Jack, Larry, and the defendant. She explained she had been homeless and was spending some nights at their apartment and some nights in a tent. Ms. Smiley testified she was good friends with Ms. Jones, had known her for over ten years, and believed Ms. Jones was also homeless in November of 2019. Ms. Smiley described the defendant as her "protector" because he would step in any time a man was being loud or violent with a woman around him. Specifically, she testified that on multiple occasions, the defendant prevented her ex-boyfriend from hitting her.

Ms. Smiley testified that Bryan was a drug dealer and they all obtained their synthetic marijuana from him. She smoked dope at Bryan's house at least 10 times. According to Ms. Smiley, she and Larry were at Bryan's apartment smoking synthetic marijuana the day Ms. Jones died. She stated the defendant was at his apartment passed out. She also testified that at one point, everyone in Bryan's home could hear screaming, which she described as two female voices "arguing back and forth." She then testified that Noah stuck his head out the door before saying "Daddy, Kayla's laying on the ground." According to Ms. Smiley, Bryan told Noah to close the door. She was adamant that Noah did not say anything else. She further stated that Noah's testimony that neither she nor Larry were present and that his dad only smoked on the porch and never in front of the kids were lies.

Ms. Smiley testified that she initially smoked a blunt with the defendant and Larry, but then she and Larry went to Bryan's apartment when the defendant passed out. According to Ms. Smiley, she returned to the defendant's apartment about an hour later, and they smoked another blunt, at which point he passed out again. Ms. Smiley heard a knock at the door; it was Ms. Jones. She told Ms. Jones she could not come in because Ms. Jack did not want her there, but Ms. Jones

15

pushed her way into the apartment. Ms. Smiley went to Bryan Love's apartment to get Ms. Jack.

According to Ms. Smiley, when she and Ms. Jack returned to the defendant's apartment, Ms. Jack and Ms. Jones started screaming at each other and got into a physical altercation which left Ms. Jones on the floor. Ms. Smiley testified that Ms. Jack either punched or pushed Ms. Jones, who ended up on the floor next to the mattress. Ms. Smiley further testified that she left while the altercation was ongoing and stated that the defendant was still passed out at that time. She also testified that Ms. Jones "wigged out" that night and that, when she saw Ms. Jones outside later, her pants were gone and her panties were wet. Ms. Smiley explained that Ms. Jones sometimes flashed out and got "butt naked."

Ms. Smiley returned to Bryan's house and smoked another blunt while Ms. Jones was wigging out at the defendant's apartment. She stated Ms. Jones was on the ground outside when she returned to her tent. According to Ms. Smiley, Ms. Jones was passed out, snoring, in just her t-shirt and panties, so she took a comforter and put it on Ms. Jones before leaving. Ms. Smiley stated that, when she saw Ms. Jones's panties were wet, she believed her water had broken and told Bryan to call 9-1-1, but he refused because he had drugs in his apartment. When she could not get anyone to call 9-1-1, Ms. Smiley went back to her tent and fell asleep until someone woke her the next day and asked if she knew Ms. Jones was killed.

On cross-examination, Ms. Smiley testified that when she left Bryan's apartment and saw Ms. Jones on the ground, the defendant was still asleep in his apartment, and she got a comforter and put it on Ms. Jones. Ms. Smiley testified she never told law enforcement she saw the defendant near Ms. Jones outside and never saw the defendant be aggressive or hostile towards a female, claiming he

"deserves wings and a halo." Ms. Smiley was adamant that she did not discuss anyone's trial testimony during the case, including with the defendant.

On rebuttal, the state recalled Sergeant Fontenot, who testified Ms. Smiley told them during her initial interview that after Noah came back into the Love's apartment, Ms. Smiley left and saw the defendant standing over Ms. Jones outside. The state also published to the jury a portion of the state's recorded interview between Sergeant Fontenot and Ms. Smiley.

### ASSIGNMENT OF ERRORS NUMBERS 1 & 2:

In his first assignment of error, the defendant argues the state failed to prove beyond a reasonable doubt that he committed manslaughter of Kayla Jones, as required by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). Specifically, he contends "the evidence was insufficient to prove beyond a reasonable doubt that Vernell Chatman killed Kayla Jones or that he committed a simple battery upon Kayla Jones that ultimately led to her death."

In his second assignment of error, the defendant contends there was insufficient evidence to support his conviction for second degree feticide, asserting:

> When viewed under the *Jackson* [*Id.*] standard, the evidence was insufficient to prove beyond a reasonable doubt that Vernell Chatman killed Kayla Jones' unborn child. The [s]tate also failed to prove beyond a reasonable doubt the cause of the unborn child's death which was necessary to establish that the unborn child was killed. Alternatively, the [s]tate failed to prove beyond a reasonable doubt that Vernell Chatman committed a battery upon Kayla Jones, and that this battery was a proximate cause of the unborn child's death. Thus, the [s]tate failed to prove that Vernell Chatman committed second degree feticide of Kayla Jones' unborn child.

We address these assignments simultaneously. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

17

proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Grafagnino v. King*, 436 So.2d 559 (La.1983), *State v. Duncan*, 420 So.2d 1105 (La.1982), *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La. 1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The defendant was charged with second degree murder but convicted of manslaughter, in violation of La.R.S. 14:31. Under La.R.S. 14:31:

A. Manslaughter is:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or

(2) A homicide committed, without any intent to cause death or great bodily harm.

(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.l, or of any intentional misdemeanor directly affecting the person; or

. . . .

(3) When the offender commits or attempts to commit any crime of violence as defined by R.S. 14:2(B), which is part of a continuous sequence of events resulting in the death of a human being where it was foreseeable that the offender's conduct during the commission of the crime could result in death or great bodily harm to a human being, even if the offender has no intent to kill or to inflict great bodily harm. For purposes of this Paragraph, it shall be immaterial whether or not the person who performed the direct act resulting in the death was acting in concert with the offender.

As noted by the state, the defendant's argument addresses only a single theory of manslaughter, i.e., the defendant killed Ms. Jones without intent to cause death or great bodily harm but while committing the intentional misdemeanor of simple battery. The state contends the defendant addresses only one theory of misdemeanor manslaughter, when the jury could have found him guilty of manslaughter and second degree feticide based on more than one theory, e.g., a specific intent killing committed in sudden passion, a killing committed while engaged in a simple battery, or a killing without specific intent as a result of the defendant's intoxication.

With regard to intoxication, the defendant filed a "Notice of Defense of Voluntary Intoxication" in which he invoked La.R.S. 14:15(2), which provides that the offender's intoxicated or drugged condition is immaterial except "[w]here the circumstances indicate that an intoxicated or drugged condition has precluded the presence of a specific criminal intent or of special knowledge required in a particular crime, this fact constitutes a defense to a prosecution for that crime." As discussed above, the testimony from multiple witnesses indicates the defendant was so high that he passed out multiple times during the late night/early morning hours that Ms. Jones died, as does his statement to law enforcement.

The defendant first argues that the state failed to establish how Ms. Jones died. Dr. Welke testified, however, that in his expert opinion, Ms. Jones died from a combination of asphyxia and hypothermia, which he opined was the result of someone sitting or pressing down on her chest while cupping their hand over her nose and mouth, which prevented her from breathing. Dr. Welke explained that the unique injury around Ms. Jones's nose was unlikely the result of a strike or punch and that his belief was strengthened by the bruising on the inside of her mouth. According to Dr. Welke, Ms. Jones either died from the asphyxia, or the asphyxia

19

caused enough damage that her brain could not tell her body to protect itself once hypothermia set in during the freezing temperatures while she was woefully underdressed.

In addition to Dr. Welke's testimony as to the cause of Ms. Jones's death, the evidence tying the defendant to her death comes from eye-witness testimony. The evidence establishes that every witness who claimed to be present during the time prior to Ms. Jones's death, except Noah, admitted to copious drug use on that day. Consequently, it is unsurprising that the testimony of the adults and Noah was inconsistent in many regards. However, as the trier of fact, "[a] jury may 'accept or reject, in whole or in part,' any witness's testimony." *State v. Hypolite*, 04-1658, p. 5 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, 1279, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381 (quoting *State v. Silman,* 95-154, p. 12 (La.11/27/95), 663 So.2d 27, 28).

Ms. Jack testified she heard the defendant tell the victim "Die, bitch, die!" Noah Love testified he saw the defendant physically attacking the victim. The jury also heard the defendant tell law enforcement that he was high on mojo and that when he was high on mojo, he sometimes hallucinated. Ms. Jack, Ms. Smiley, and Larry Chatman all testified that the day Ms. Jones died, the defendant spent most of the time high and getting high.

Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found the defendant suffocated Ms. Jones before leaving her in extremely cold weather with very little clothing, resulting in her death. Furthermore, a rational juror could have found the defendant lacked any intent to cause death or great bodily harm because he was highly intoxicated. Accordingly, there was sufficient evidence for the jury to find the defendant guilty of manslaughter, and the defendant's first assignment of error lacks merit.

20

As to the defendant's conviction of second degree feticide for the death of Ms. Jones's unborn child, Dr. Welke testified the child had a gestational age of a little over eight months, weighed a little over eight pounds, and in his opinion, was viable. Furthermore, Dr. Welke testified that he believed the child died "as a result of the mother's death." Under La.R.S. 14:32.5,

> Feticide is the killing of an unborn child by the act, procurement, or culpable omission of a person other than the mother of the unborn child. The offense of feticide shall not include acts which cause the death of an unborn child if those acts were committed during any abortion to which the pregnant woman or her legal guardian has consented or which was performed in an emergency as defined in RSS. 40:1061.23. Nor shall the offense of feticide include acts which are committed pursuant to usual and customary standards of medical practice during diagnostic testing or therapeutic treatment.

Second degree feticide is prohibited by La.R.S. 14:32.7, which states in pertinent part:

> A. Second degree feticide is:
>
> . . . .
>
> (2) A feticide committed without any intent to cause death or great bodily harm:
>
> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 32.6 (first degree feticide), or of any intentional misdemeanor directly affecting the person[.]

In order to convict the defendant of second degree feticide in the instant case, the state had to prove that an unborn child died as a result of some act or omission of the defendant not related to a legal abortion, and that it occurred when the defendant was engaged in the perpetration or attempted perpetration of any intentional misdemeanor directly affecting the person. Here, based on the trial court's jury instruction, that misdemeanor would be simple battery. A battery is relevantly defined in La.R.S. 14:33 as "the intentional use of force or violence upon the person of another," while La.R.S. 14:35(A) defines a simple battery as "a

21

battery committed without the consent of the victim." Based on the evidence herein, the jury could have found that the defendant committed a simple battery either by kicking and hitting Ms. Jones as described by Noah Love or by covering her nose and mouth while sitting on her chest as described by Dr. Welke. Therefore, when viewed in the light most favorable to the prosecution, Dr. Welke's testimony that the child died because Ms. Jones died supports a rational juror's finding the defendant guilty of second degree feticide.

The defendant contends the state failed to prove how the child died, much less that it was the result of any act or omission by him. He further argues that Dr. Welke's "feeling" the child died because his mother died is insufficient to satisfy the state's burden of proof. Although Dr. Welke acknowledged he did not perform any autopsy on the child and simply testified he felt the death of Ms. Jones caused the death of the child, he was accepted, without objection, as an expert in the field of forensic pathology. Accordingly, we find his opinion as to the child's cause of death is sufficient evidence to support the defendant's conviction of second degree feticide.

Finally, the defendant contends that under the literal language of La.R.S. 14:32.7(A)(2)(a), the intentional misdemeanor at issue had to be directed at the unborn child, not Ms. Jones. To support this claim, he relies on language in *State v. Smith*, 95-61 (La. 7/2/96), 676 So.2d 1068. A review of *Smith* shows his argument lacks merit. In *Smith*, as here, the evidence established that the death of the mother, who died by strangulation, caused the death of her four-month-old unborn child. The court determined:

> As an element of manslaughter (La.R.S. 14:31), the legislature explicitly states that a homicide or killing of an individual must take place. As an element of second degree feticide or any other grade, the legislature states that the killing of an unborn child must take place. Therefore, it is abundantly clear that the legislature intended that the

22

two instant crimes are separate and distinct, and are not lesser or included offenses of each other.

> Applying the principle of "common sense" enunciated in *State v.* [*v. Smith,* 94-0621, 647 So.2d 1321 (La.App. 4th Cir.1994) on remand for resentencing], had the legislature not intended that a perpetrator be penalized separately for killing an unborn child where the mother is also killed, it would not have made feticide a crime. The two statutes were aimed at different evils which proves that the court of appeal erred when the conviction for second degree feticide was set aside based on the "same evidence" test. Killing the mother was an element of manslaughter, not second degree feticide, whereas killing of the unborn child was an element of second degree feticide and not manslaughter. These two crimes involve different elements and require different proof. Hence, the jury did not violate the defendant's right against double jeopardy when it imposed separate punishments.

*Smith*, 676 So.2d at 1071-72 (footnotes omitted).

In *Smith*, as here, the defendant's conviction of feticide was predicated on the fact that the unborn child died as a result of the mother being strangled to death. There was no evidence that any misdemeanor was aimed at the fetus. Nonetheless, the supreme court reinstated the defendant's conviction for second degree feticide. Consequently, the defendant's reliance on *Smith* is misplaced. Accordingly, the defendant's second assignment of error lacks merit, and both of his convictions are affirmed.

## ASSIGNMENT OF ERROR NO. 3:

In his third assignment of error, the defendant asserts that his conviction for second degree feticide violated the double jeopardy clauses of the U.S. and Louisiana constitutions, U.S. Const. Amend. V; La. Const. art. I, § 15, because proof of the killing of Ms. Jones, was the only possible cause of death offered in evidence for the death of her unborn child died. He argues there was "no proof of a fact the state had to prove for the misdemeanor manslaughter, even though second degree feticide required the additional proof of the death of the unborn child," and concludes the "same evidence" was used to prove violations of both La.R.S. 14:31

and La.R.S. 14:32.7. As the defendant notes, the "same evidence" test is no longer used. *State v. Frank*, 16-1160 (La. 10/18/17), 234 So.3d 27.

Again, the defendant assumes the jury convicted him of misdemeanor manslaughter, not one of the other theories set forth in La.R.S. 14:31(A)(2)-(3), and contends that because his act or omission that resulted in the death of the unborn child caused the death of the mother, his conviction for the lesser offense cannot stand. He asserts the trial court failed to apply the test for double jeopardy announced in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932), which provides, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

The outcome here is no different under the standard set forth in *Blockburger*. As discussed in *Smith*, second degree feticide requires proof of the killing of an unborn child whereas manslaughter requires proof of the killing of an individual. Accordingly, the defendant's convictions of second degree feticide and manslaughter do not violate the constitution prohibitions against double jeopardy, and both convictions are affirmed.

**ASSIGNMENT OF ERROR NO. 4:**

Lastly, the defendant contends that his consecutive sentences of thirty-two years and eight years at hard labor are unconstitutionally excessive. He filed a "Motion to Reconsider Sentence," asserting that his sentence is excessive "for the facts of this case" and "under the circumstances." Louisiana Code of Criminal Procedure Article 881.1(E) requires that the motion "include a specific ground upon which a motion to reconsider sentence may be based." His failure to satisfy this requirement precludes him "from urging any ground not raised in the motion

24

on appeal or review." La.Code Crim.P. art. 881.1(E). Nonetheless, this court has reviewed claims of sentences being excessive where no objection was made and no motion to reconsider sentence was filed. *See State v. Johnlouis*, 09-235 (La.App. 3 Cir. 11/4/09), 22 So.3d 1150, *writ denied*, 10-97 (La. 6/25/10), 38 So.3d 336, *cert. denied*, 562 U.S. 1150, 131 S.Ct. 932 (2011). In the interest of justice, and given our discretion to do so, we will review the defendant's claim as a bare claim of unconstitutional excessiveness. *Id.*

Louisiana courts have laid out the following guidelines for excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado,* 367 So.2d 762 (La.1979). In *State v. Barling,* 00–1241, 00–1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43, *writ denied,* 01–838 (La.2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:
>
>> La. Const. art. I, 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).
>
> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La. 1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4

(La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d I (La.App. I Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

In *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writs denied*, 07-320 (La. 11/9/07), 967 So.2d 496 and 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test from *State v. Lisotta*, 726 So.2d 57. Under *Baker*, 956 So.2d 83, the first consideration is the nature of the crimes. The defendant was convicted of manslaughter and second degree feticide; both offenses necessarily involve the death of either an individual or an unborn child. While the defendant contends the jury "concluded a simple battery ultimately led to the deaths of Kayla Jones and her unborn child," the jury could have found the defendant guilty under other theories, such as the defendant being so intoxicated that he lacked intent when he suffocated Ms. Jones to death or to the point of brain damage before leaving her to die of hypothermia.

The defendant's argument against his sentencing exposure primarily falls into the second *Baker* factor, the nature and background of the offender. The defendant contends that his history shows possible mental health issues and a definite substance abuse problem, claiming "[m]ost of his arrests, which stretched decades, were drug-related." The defendant was a week shy of his thirty-sixth

birthday when he was sentenced and stated during trial that he completed the eleventh grade and did not have a GED. At sentencing, the trial court acknowledged that the defendant did not have a significant criminal history and that his criminal history consisted primarily of "drug-related [charges] and noncompliance with court appearances." The trial court further acknowledged that he appeared to have some "significant addiction issues" and that he potentially had some mental health issues that "need to be addressed."

The final *Baker* factor is sentences imposed for similar crimes. The defendant received a thirty-two year sentence for manslaughter and an eight year sentence for second degree feticide, with the sentences ordered to run consecutively. He faced maximum sentences of forty years and ten years, respectively. Therefore, his sentences both represent eighty percent of the possible maximums. The trial court ordered that the sentences run consecutively, so his sentences combine for forty years total.

There is very little case law on second degree feticide. However, in *Smith*, 676 So.2d 1068, the defendant was sentenced to thirty years for manslaughter and ten years, the maximum, for second degree feticide. The sentences were not ordered to run consecutively, but the maximum ten-year sentence for second degree feticide, when the evidence was that the child died because the mother died, is particularly telling. Additionally, our courts have previously upheld maximum sentences for manslaughter convictions, even for first offenders. *See State v. Herbert*, 12-228 (La.App. 3 Cir. 6/13/12), 94 So.3d 916, *writ denied*, 12-1641 (La. 2/8/13), 108 So.3d 78; *State v. Johnson*, 38,415 (La.App. 2 Cir. 7/14/04), 878 So.2d 869, *writ denied*, 05-589 (La. 1/13/06), 920 So.2d 222.

In addition to his claim that his sentences are excessive individually, the defendant also argues his sentences are excessive because the trial court ran them

consecutively rather than concurrently. In La.Code Crim.P. art. 883, the legislature set forth the following regarding sentencing:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.

In *State v. Bethley*, 12-853, pp. 11-12 (La.App. 3 Cir. 2/6/13), 107 So.3d 841, 850, this court noted:

> The imposition of consecutive sentences, however, requires particular justification beyond the standard sentencing guidelines, justification which must be articulated by the trial court at sentencing. *State v. Compton*, 11-68 (La.App. 3 Cir. 6/1/11), 66 So.3d 619, *writ denied*, 11-1362 (La. 12/2/11), 76 So.3d 1177. "The factors to consider when imposing consecutive sentences include defendant's criminal record, the severity or violent nature of the offenses, or the danger the defendant poses to the public." *State v. Wallace,* 11-1258, p. 14 (La.App. 3 Cir. 5/30/12), 92 So.3d 592, 602.

In addition to its normal discussion of the factors considered in crafting the defendant's sentence, the trial court noted the following:

> I do find this to be a tragic case with families losing on both sides. The Court is constantly involved with the plague of drugs and their after-effects and consequences in which people have placed themselves in such a situation these losses occur; but the cruelty and disregard that the Court saw in this trial, disturbs that, and hopefully that will haunt you, Mr. Chatman[,] for some time.

This court has previously noted that "an order directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence or record, and the trial court shall state the factors considered and its reasons for the consecutive terms." *State v. Urena*, 13-1286, p. 21 (La.App. 3 Cir. 5/7/14), 161 So.3d 701, 715, *writ denied*, 14-1603 (La. 4/10/15), 164 So.3d 829.

When imposing consecutive sentences, the trial court observed this is a tragic case that resulted from the defendant's voluntary use and abuse of drugs to the extent that use affected not only himself but other individuals and their families as well. The court also noted the defendant's cruelty and disregard for Ms. Jones and her unborn child, who was sufficiently developed to survive on his own with appropriate care. Thus, the defendant caused the death of two individuals, Ms. Jones and her unborn child.

For these reasons, the defendant's sentences of thirty-two years at hard labor for his manslaughter conviction and eight years at hard labor for his second degree feticide conviction are affirmed. The trial court's order that his sentences be served consecutively sentences is also affirmed.

## DISPOSITION

As discussed above, the defendant's convictions and sentences are affirmed.

**AFFIRMED.**

29